Filed 9/21/21  P. v. Munoz CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E075567 |
| v. | (Super.Ct.No. RIF1701638) |
| JUDITH MONTSERRATH HERNANDEZ MUNOZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Mark E. Johnson, Judge.
Affirmed.

Edward R. Muñoz for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney

General, Julie L. Garland, Senior Assistant Attorney General, and Steve Oetting and

Amanda Lloyd, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Judith Montserrath Hernandez Munoz called 911 because her seven-

week-old baby daughter was not breathing.  The baby was found to have a fresh skull

1

fracture, two leg fractures (one fresh and one healing), and healing rib injuries. Defendant told the police that the baby had fallen off a couch about two weeks earlier. She also mentioned that the baby cried constantly.

In a jury trial, defendant was found guilty on three counts of child abuse likely to produce great bodily injury or death (§ 273a, subd. (a).)[1] One enhancement for personally inflicting great bodily injury on a child under the age of five (§ 12022.7, subd. (d)) was found true. Defendant was sentenced to eight years eight months in prison, along with the usual fees, fines, and ancillary orders.

Defendant contends:

(1) The trial court erred by excusing a juror who called in sick.

(2) Evidence that the baby had symptoms at birth that were consistent with neonatal abstinence syndrome was irrelevant and inflammatory.

(3) The prosecutor committed misconduct by eliciting the evidence regarding neonatal abstinence syndrome.

(4) Defense counsel rendered ineffective assistance by failing to object to the evidence regarding neonatal abstinence syndrome.

(5) One expert witness improperly testified to case-specific hearsay.

(6) The opinions of two expert witnesses as to how or why the baby's injuries may have been inflicted were speculative and lacked foundation.

---

[1] This and all further statutory citations are to the Penal Code, unless otherwise indicated.

2

(7) The prosecutor committed misconduct in closing argument by:

(a) Arguing facts not in evidence and appealing to passion and prejudice.

(b) Commenting on defendant's constitutional right to subpoena witnesses.

We find no prejudicial error that has been preserved for appeal. Accordingly, we will affirm.

I

STATEMENT OF FACTS

A. *The Prosecution Case.*

1. *The baby's initial health.*

Defendant lived with her husband and children in Perris. She had a four-year old, a two-year-old, and a one-year-old. Her husband worked long hours; he was home only between 7:00 p.m. and 4:00 a.m.

On May 19, 2016, defendant gave birth to a fourth child, a girl. The baby was admitted to the Neonatal Intensive Care Unit (NICU) for observation because "she had hyperirritability, [an] exaggerated startle response, disorganized nibbling, [and a] very high pitched cry," plus she was arching her back. These could be symptoms of neonatal abstinence syndrome, i.e., drug withdrawal. They could also be symptoms of a neurological problem. However, drug testing of the baby was negative. Brain and bone scans showed nothing remarkable. After a few days, "[t]he problem was resolved," "the baby was fine," and she was released from the hospital.

On May 27, when the baby was eight days old, a pediatrician saw her for her newborn checkup. The pediatrician examined the baby "from head to toe" and found that she was "completely healthy."

On June 20, when the baby was four weeks old, the same pediatrician saw her for a follow-up visit. Defendant mentioned that the baby was "crying a lot and being fussy[.]" Once again, the pediatrician found that she was "a normal, healthy baby."

### 2. *The baby's hospitalization.*

On July 11, when the baby was seven weeks old, defendant called 911. The baby was taken by ambulance to Riverside County Regional Medical Center (Riverside Regional). When she arrived, she was unresponsive, not breathing, and having seizures. She had a bruise on her chest.

Riverside Regional did a CT scan of her head; it showed a "significant" skull fracture. She was transferred to the Loma Linda University Medical Center (Loma Linda), because it had a pediatric trauma center.

### 3. *Defendant's statement to the police.*

On July 12, a police officer interviewed defendant. Defendant said the baby was "extremely fussy." "[I]f the baby wasn't sleeping, the baby was crying." "And she had difficulties with the child due to that." Defendant had trouble sleeping because of the crying.

4

Defendant said she believed the baby's head injury had been caused by a fall from the couch about two weeks earlier. At the time, defendant was in the kitchen making a bottle; her other children were in a bedroom.

On July 11, while defendant was changing the baby's diaper, the baby became fussy and began crying. Defendant went into the kitchen to get a bottle. The crying stopped. When defendant came back, the baby was "struggling" to breathe. Defendant called 911 and started CPR. There was no one else around at the time. Her husband was not home.

The police officer measured the couch and found it to be between a foot and a half and two feet high.

        4.     *Expert testimony.*

        a.     *The injuries found.*

Meanwhile, on July 11, Loma Linda did an MRI and a full body bone scan. At that point, the Riverside Regional and/or Loma Linda head scans showed a depressed Y-shaped skull fracture, with multiple bone fragments.

The bone scan showed two leg fractures. One fracture, of the femur, near the knee, had not yet begun to heal. The other, of the tibia, near the ankle, was already in the process of healing.

On June 13, Loma Linda did CT scans of the baby's head and torso. The torso scan showed widening of two left ribs.

The baby also had a torn frenulum.

5

### b. *Dr. Harder*: *The skull and brain injuries*.

Dr. Sheri Harder, a pediatric neuroradiologist, testified that the branching and fragmented nature of the skull fracture suggested a "point injury," such as hitting or being hit by the corner of something. There was soft tissue swelling over the fracture, fresh bleeding inside the skull, and brain injuries due to lack of oxygen; also, the bones had not yet begun to heal. All of this indicated that the injury had happened recently, not two weeks earlier.

By July 13, there was a buildup of pressure in the baby's brain. Such swelling is at its maximum within 24 to 48 hours after injury. Thus, this indicated that the injury occurred on July 11.

A child would not normally get a skull fracture from a fall of two feet onto a hard wood surface.

On July 20, Loma Linda did a repeat MRI. It showed that blood was continuing to leak inside the baby's skull. That can mean that certain veins have been torn. That, in turn, would indicate "movement back and forth," such as shaking. The continued bleeding was not consistent with the skull fracture alone.

### c. *Dr. Miller*: *The leg and rib injuries*.

Dr. John Miller, a pediatric radiologist, testified that the knee fracture occurred "a day or two" before the bone scan. It could have been caused by "a very, very sharp shake with a lot of force . . . ."

6

The ankle fracture was at least two weeks old, though still relatively recent. It could have been caused by grabbing the foot and shaking it very hard. "[O]ften it's done to stop them from crying because some adult doesn't want them to cry."

The rib widening was "a reparative response," indicating an injury caused by force. This "was concerning for healing . . . rib fractures . . . ."[2] However, the changes were "subtle" and not "to the same extent as the knee or the ankle." "This is a very characteristic injury when the baby is grabbed by the chest and . . . shaken or squeezed [in] an attempt to stop them from crying . . . ."

In Dr. Miller's opinion, all of these injuries were inflicted trauma — "Someone has done this to this child." They could not have occurred at birth, and they could not have been caused by a two-foot fall onto a hard wood floor.

d.      *Dr. Young:  Causation of the injuries*.

On July 13, Dr. Amy Young, a forensic pediatrician, reviewed the baby's medical records. She also carried out a physical examination.

She testified that the baby's injuries had "a high specificity for child abuse." They could not have been caused by normal diaper changing, by defendant's efforts at CPR, nor by one of defendant's other children. The baby's torn frenulum was "significant," because "it's a sign often of abusive injury." It could not have occurred when the baby was intubated.

---

[2]      The July 11 bone scan had shown no new or healing rib fractures. There was testimony, however, that it is often easier to see an infant's ribs in a CT scan than in a full-body bone scan.

A baby with the head injury in this case would show symptoms immediately.

The baby's liver enzymes were high but falling, suggesting that she was recovering from a liver injury. Such an injury can occur if a baby's chest is squeezed.

5. *Defendant's statement to Dr. Young*.

Also on July 13, Dr. Young met with defendant. At first, defendant gave her essentially the same account that she had already given to the police. Defendant added that, on another occasion, before the fall, the baby "became unresponsive" but recovered when the father performed CPR.

After Dr. Young told defendant about the baby's injuries, however, defendant said "she believed she had caused" them.

She said that when she found out she was pregnant with the baby, she was "stressed out." She considered having an abortion.

After the baby was born, defendant said, she was "[s]tressed, frustrated," and "overwhelmed" by caring for the baby as well as her other children and the family's animals. She had "[a] hard time . . . bonding with the baby . . . ." "[T]he baby was crying and fussy all the time[.]" The family also had financial problems; for example, defendant had to use a hose to fill the washing machine.

Defendant admitted "squeezing the baby," "hard and fast," "around the abdomen and chest," so the baby would "quit crying." She had seen bruises in this area. She also admitted "shaking the baby" and squeezing her ankles, which made the baby cry. Once, she saw blood in the baby's mouth.

Defendant denied that the father was ever abusive.

B.    *Defense Case.*

Defendant's aunt saw the baby "a few times," at the hospital and at home.  The baby "wouldn't stop crying."  There was "pain in her face" and she appeared to be uncomfortable when lying down.  When the aunt phoned, she "could hear the baby crying constantly."  Defendant treated the baby with extra care.

A family friend testified that defendant "took care of her children well."  At the hospital, the baby was "crying a lot"; she cried even more when he held her.  When he saw her at home, she was still crying a lot.

Defendant testified on her own behalf.  She denied injuring the baby or telling anyone that she squeezed the baby or caused the baby's injuries.

Defendant also denied being stressed or frustrated after the baby was born, except that she was "stressed with not being able to figure out [the baby]'s needs."  The baby cried "[m]ost of the time."  She seemed to be uncomfortable, and nothing defendant did seemed to soothe her.

There were mattresses on the floor of the living room, because it was too hot to sleep in the bedroom.  Once or twice, defendant's older children jumped on the mattresses.

One time, when the baby was five or six weeks old, defendant was in the kitchen, preparing a bottle, when she heard a thud.  She found that the baby had rolled off the

9

couch and was crying. The baby developed a small bump on her head. Defendant put ice on it and it went away.

On July 11, defendant was in the kitchen, preparing a bottle again, when the baby suddenly got quiet. She found that the baby had stopped breathing and was unresponsive. Defendant called 911 and started performing CPR. She believed the bruise on the baby's chest was from CPR.

## II

### THE EXCUSAL OF A JUROR WHO CALLED IN SICK

Defendant contends that the trial court erred by excusing a juror who called in sick. She argues that it did so without giving adequate notice to the parties. She also argues that it did not conduct an adequate inquiry.

A.  *Additional Factual and Procedural Background.*

On February 3, 2020, the jurors were sworn, preinstructed, and then sent home.

On February 4, 2020, at the beginning of the proceedings, the trial court said:

"THE COURT:  (TJ01) called in this morning and said he's sick. I suppose I have the option of delaying the trial until he's recovered his health. But all I can say is this is what alternates are for.

"[Clerk], would you write the names of (TAJ1) and (TAJ2), put them in something like a cup, turn your head away, and pick a name.

"THE CLERK:  I already have it ready. It'll be (TAJ2)."

Defense counsel did not object.

10

B.    *Discussion.*

"Trial courts may remove any juror who 'becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty . . . .' (§ 1089.)  A trial court learning of grounds for dismissal 'has an affirmative obligation to investigate.'  [Citation.]  However, '[b]oth the scope of any investigation and the ultimate decision whether to discharge a given juror are committed to the sound discretion of the trial court.'  [Citations.]"  (*People v. Duff* (2014) 58 Cal.4th 527, 560.)

"We will uphold the trial court's decision if the record supports the basis for that decision as a '"demonstrable reality."'  [Citation.]  This means simply that the record must reveal the reason for the court's decision to discharge a juror and in turn substantial evidence must support that reason.  [Citation.]  So long as it does, '"the court's action will be upheld on appeal."'  [Citation.]"  (*People v. Peterson* (2020) 10 Cal.5th 409, 472-473.)

Preliminarily, defense counsel forfeited defendant's present contention by failing to raise it in the trial court.  (*People v. Fudge* (1994) 7 Cal.4th 1075, 1100-1101.)  This is true even though defendant is arguing, among other things, that the trial court did not give her and her counsel adequate notice.  "It is well-established that a lack of notice can be forfeited by failure to object, even when it is claimed that it violated due process.  [Citation.]"  (*People v. Nguyen* (2017) 18 Cal.App.5th 260, 271.)

Defendant claims that an objection would have been futile because the court clerk had already chosen an alternate juror.  Not so.  If defense counsel had objected, the trial

11

court could simply not have seated the alternate until it had inquired further of Juror

No. 1.**3**

Separately and alternatively, the trial court did not err. The juror had called in and

said that he was sick. Defendant argues that "the trial court made no inquiry

whatsoever." (Bolding omitted.) However, "[i]n cases of illness, a court is not obligated

to call a juror into court to substantiate his or her excuse and can rely on phone calls

instead. [Citation.]" (*People v. Duff*, *supra*, 58 Cal.4th at p. 560, fn. 15.) Defendant also

argues that "[t]here was no indication and no facts mentioned that would support a

conclusion th[at] Juror Number 1 would not be able to perform his . . . duties as a juror."

But there was. In the juror's own view — which was an admissible lay opinion (Evid.

Code, § 800) — he was too sick to serve.

In *People v. Hess* (1951) 104 Cal.App.2d 642, a juror asked to be excused because

her father had had a stroke. The trial court excused her, over the defendants' objection.

(*Id*. at p. 679.) On appeal, the defendants argued that the trial court erred because there

was no "'legal showing as to the condition of the juror's father." (*Id*. at p. 680.) The

appellate court disagreed: "In the absence of any attempt on the part of appellants to

inquire into the source of the court's information concerning the illness of the juror's

---

**3**     Defendant seems to assume that the trial court had already told Juror No. 1
that he was excused. However, the record does not show this. The minute order recites
that he was excused after the discussion between the court and counsel. Therefore, we
need not decide whether the assumed fact would make a difference.

12

father, we must assume that the court had good cause to believe that her father had suffered a severe [stroke]." (*Id.* at p. 681.)

In any event, the trial was about to start, and the juror, for whatever reason, was not there. The trial court could reasonably seat an alternate rather than make everybody wait.

The trial court gave defendant notice of its intent to excuse the juror by stating in open court that it was doing so. Defendant cites no authority that she was entitled to any additional notice. She also does not explain what she would have done differently if she had had additional notice.

In her reply brief, defendant contends, for the first time, that her trial counsel's failure to raise this issue (among others) in the trial court constituted ineffective assistance. She forfeited all of these contentions by failing to raise them in her opening brief. (*People v. Duff*, *supra*, 58 Cal.4th at p. 550, fn. 9.)

With regard to defense counsel's failure to object to the excusal of Juror No. 1, we also reject the ineffective assistance contention on the merits.

"To make out a claim that counsel rendered constitutionally ineffective assistance, 'the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.' [Citation.] To make out an ineffective assistance claim on the basis of the

13

trial record, the defendant must show '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding.' [Citation.]" (*People v. Hoyt* (2020) 8 Cal.5th 892, 958.)

As we have just held, the trial court properly excused the juror. Hence, counsel was not deficient for failing to object. Moreover, defendant has not shown any prejudice.

III

CONTENTIONS REGARDING EVIDENCE OF

NEONATAL ABSTINENCE SYNDROME

Defendant raises several contentions related to the evidence of neonatal abstinence syndrome (syndrome).

A. *Admission of Evidence of the Syndrome*.

First, defendant contends that the evidence of the syndrome was irrelevant and inflammatory.

Defense counsel forfeited any contention that this evidence was inadmissible by failing to object at trial. (Evid. Code, § 353, subd. (a); *People v. Cage* (2015) 62 Cal.4th 256, 282.)

Nevertheless, we discuss this contention on the merits, because our discussion will also be pertinent to defendant's other contentions concerning the syndrome.

We agree that the evidence was irrelevant, and even if relevant, it was unduly prejudicial. Evidence that the baby had certain symptoms that caused her to be admitted to the NICU *was* relevant. Indeed, this evidence tended to help the defense, because it suggested the possibility that the baby was born with some condition that might have predisposed her to broken bones and/or bleeding on the brain. By contrast, the specific fact that the syndrome could cause those symptoms had no probative value.

The People argue that the evidence was relevant because, "[g]iven that [the syndrome] was suspected at [the baby]'s birth, it was important to show that [the syndrome] was ruled out and [the baby] was sent home from the hospital after testing came back normal." The catch in that argument is its premise — "[g]iven that [the syndrome] was suspected at [the baby]'s birth." However, that is the very evidence that should not have come in. Had it not come in, there would have been no need to show that the syndrome was ruled out; it would have been sufficient to show that no underlying condition was found and that the baby got well and was sent home.

Ultimately, however, the evidence was not prejudicial. As defendant's own brief says, "no evidence of drug or alcohol abuse was found." (Bolding omitted.) Dr. Young testified that both urine and meconium drug tests were negative. She agreed that "since they sent the baby home with the mother four or five days after the baby was born, they were pretty satisfied that there was no drug issue[.]" Thus, there is no reasonable possibility that (as defendant puts it) the "jurors may have wanted to punish [defendant] for her drug use during her pregnancy."

15

Defendant argues that the drug tests did not rule out drug abuse: "The child was exhibiting withdrawal symptoms. Withdrawal symptoms indicate a lack of drugs in the child's system, not the presence of drugs." (Bolding omitted.) However, there was no *evidence* of that. From the very fact that the hospital tested the baby, it is inferable that a baby going through withdrawal would test positive. Moreover, the hospital did a meconium test. Meconium forms while the baby is still in the womb; thus, presumably, the test could detect even drugs that were no longer circulating in the baby's system. The hospital also "did . . . Finnegan scores where they are watching the baby to see if they have any signs of withdrawal." Evidently these scores showed that the baby did not have the syndrome.

Finally, the evidence was harmless for a separate and additional reason: The evidence of guilt was overwhelming. There was no doubt that the baby had a skull fracture and two leg fractures. The evidence regarding the rib injuries was slightly weaker, as no rib fractures were seen in the July 11 bone scan. However, Dr. Young explained that a rib fracture will not necessarily show up in a bone scan; Dr. Miller did not specifically testify that the rib injuries were fractures; and liver enzymes showed a liver injury. Some of the baby's injuries had occurred earlier than others. The experts testified that all of them could only have been intentionally inflicted. The evidence ruled out other causes, including defendant's only proffered explanation, namely, a fall from the couch two weeks earlier. According to Dr. Young, defendant admitted that "she believed she had caused" the baby's injuries. She specifically admitted squeezing the

16

baby to make her stop crying. She also admitted an apparent motive — she was stressed out, by, among other things, the baby's constant crying.

In light of this evidence, there is no reasonable possibility that, in the absence of the evidence regarding the syndrome, defendant would have enjoyed a more favorable verdict.

B.      *The Prosecutor's Questioning About the Syndrome*.

Second, defendant contends that the prosecutor committed misconduct by eliciting evidence of the syndrome.

Defense counsel forfeited this contention by failing to object below. "'It is well settled that making a timely and specific objection at trial, and requesting the jury be admonished . . . , is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal.' [Citation.]" (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1164, pet. for cert. filed, Jun. 28, 2021.)

The contention lacks merit in any event. Defendant relies exclusively on cases holding that it is misconduct for a prosecutor to knowingly introduce false or misleading evidence. As she notes, "the prosecution has the duty to correct the testimony of its own witnesses that it knows, or should know, is false or misleading. [Citation.]" (*People v. Morrison* (2004) 34 Cal.4th 698, 716-717.) Here, however, to the extent that the evidence of the syndrome was potentially misleading, the prosecutor did correct it, by introducing evidence that the baby tested negative for the syndrome.

Defendant does not argue or cite authority for any other theory of prosecutorial misconduct, and thus has forfeited any.

If only out of an excess of caution, however, we consider one other theory — that the prosecutor intentionally elicited inadmissible evidence. "'Although it is misconduct for a prosecutor *intentionally* to elicit inadmissible testimony [citation], merely eliciting evidence is not misconduct. Defendant's real argument is that the evidence was inadmissible.' [Citation.] Although the prosecutor in this case certainly asked the questions intentionally, nothing in the record suggests [s]he sought to present evidence [s]he knew was inadmissible . . . ." (*People v. Chatman* (2006) 38 Cal.4th 344, 379-380.)

Finally, for the reasons just discussed in part III.A, *ante*, the asserted misconduct was harmless.

C. *Ineffective Assistance of Counsel.*

Third, defendant contends that defense counsel rendered ineffective assistance by failing to object to the evidence of the syndrome.

"'[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.' [Citation.]" (*People v. Romero and Self* (2015) 62 Cal.4th 1, 25.) This is not a case where there could be no satisfactory explanation for the failure to object. Defense counsel may not have wanted to call attention to the evidence, especially as it was harmless once it was shown that the baby did not actually have the syndrome. Indeed, he may have wanted to prevent the jurors from speculating

18

on their own that the symptoms that landed the baby in the NICU were due to drug withdrawal.

Last but not least, for the reasons already stated in part III.A, *ante*, the evidence was not prejudicial.

IV

ADMISSIBILITY OF THE EXPERTS' TESTIMONY

Defendant takes issue with the admissibility of some of the experts' opinions.

A. *Dr. Harder's Testimony to Case-Specific Hearsay.*

Defendant contends that Dr. Harder improperly testified to case-specific hearsay.

She cites Dr. Harder's testimony that "we were told that [the baby] was found unresponsive, apneic, and seizing." Later, when she was asked, "What is it about [the head] injuries that are suspect [for] nonaccidental trauma?," she answered, in part, "So looking at what was described as the patient was found having a seizure and not breathing is not compatible with what I'm seeing from an imaging perspective. So there was an injury. . . . [T]his isn't something that just happens." Defendant also notes that Dr. Harder reviewed and relied on a CT scan done at Riverside Regional.

Defense counsel forfeited this contention by failing to object below. Defendant also forfeited any contention that this was ineffective assistance of counsel by failing to raise it in her opening brief. (See part II.B, *ante*.)

Defendant has not shown ineffective assistance in any event. An expert (or a lay witness, for that matter) cannot testify to case-specific hearsay unless there is an

19

applicable hearsay exception.  (*People v. Valencia* (2021) 11 Cal.5th 818, 831-833.)

"'Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried.'  [Citation.]"  (*Id*. at p. 831.)

We agree that the challenged testimony included case-specific hearsay.  Dr. Harder testified to the baby's condition before the baby arrived at Loma Linda, evidently based on records from the ambulance company and/or Riverside Regional.[4]

These records, however, were admissible under the hearsay exception for business records (Evid. Code, §§ 1270-1271), provided the prosecutor laid the necessary foundation.  If defense counsel had objected, the prosecutor could simply have called the relevant custodian of records.  The records would still have come in.  Thus, defendant cannot show prejudice.

Defendant also cannot show deficient performance.  This is not a case in which the failure to object could have no satisfactory explanation.  Defense counsel could have decided that forcing the prosecution to call the custodian of records would likely (1) prolong the trial, and (2) impress the jury with the thoroughness of the prosecution and the credibility of the experts.  Indeed, for all we know, the prosecutor may have done some favor for him in return for his courtesy in this regard.

---

    **4**      Dr. Harder's testimony about the Loma Linda CT scan may or may not have been case-specific hearsay, depending on whether she was qualified to interpret it herself or she was relying on a written interpretation by a radiologist at Loma Linda. We may assume, without deciding, that it, too, was case-specific hearsay.

B.      *The Foundation for Dr. Harder's Opinions.*

Defendant contends that some of Dr. Harder's opinions were speculative and did not have an adequate foundation.

As relevant here, Dr. Harder testified that the baby's skull fracture could have been caused by her head hitting or being hit by the corner of something, and that her continuing bleeding on the brain could have been caused by being shaken.

Defendant counsel forfeited this contention by failing to object below.  Defendant also forfeited any contention that this was ineffective assistance of counsel by failing to raise it in her opening brief.  (See part II.B, *ante*.)

Even if not forfeited, the contention lacks merit.

An expert can testify to an opinion "[b]ased on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing . . . that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates . . . ."  (Evid. Code, § 801, subd. (b).)  "But 'the expert's opinion may not be based "on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors."'  [Citations.]"  (*People v. Flores* (2020) 9 Cal.5th 371, 398.)

Here, the baby's medical records showed that she had "a very complex comminuted fracture" — complex, meaning that the fracture branched out in several directions, and comminuted, meaning that the bone was "shattered."  Dr. Harder testified

that a complex comminuted fracture "often" indicates "a point injury . . . ." She gave the example of an impact between the head and a corner. She agreed that it could also occur in a car crash, from being hit by a bat, or in a fall from a one or two-story building.

This opinion was properly produced by the application of Dr. Harder's knowledge, training, and experience to facts in evidence. "An expert medical witness may give his opinion as to the means used to inflict a particular injury, based on his deduction from the appearance of the injury itself. [Citation.]" (*People v. Jackson* (1971) 18 Cal.App.3d 504, 507.) Thus, a doctor could properly testify that a patient with a low fever, a runny nose, sneezing, coughing, and a sore throat probably has a cold. We are at a loss to imagine what other facts defendant would require. "A physician is not required to personally replicate all medical experiments dating back to the time of Galen in order to relate generally accepted medical knowledge that will assist the jury in deciding the case at hand." (*People v. Sanchez* (2016) 63 Cal.4th 665, 675.) The same analysis applies to the testimony that the baby may have been shaken.

In her reply brief, defendant also contends that Dr. Harder improperly gave a legal opinion, by supposedly testifying that the baby's injuries were evidence of child abuse. She forfeited this contention by not raising it in her opening brief. (See part II.B, *ante*.)

If only out of an excess of caution, we also reject it on the merits. Defendant cites this testimony:

"Q. . . . So you used the word nonaccidental trauma. What is that?

"A. It's a term that we used to describe trauma that's inflicted on children.

22

"Q. So, I guess, in the layman terms, we would call that child abuse?

"A. Yes."

Dr. Harder specifically testified that she was using "child abuse" as a layperson's term. She did not give a legal opinion.

C.     *The Foundation for Dr. Miller's Opinions.*

Defendant contends that portions of Dr. Miller's opinions were speculative.

Regarding the ankle injury, Dr. Miller testified:

"Q. What kind of mechanism would case this type of injury in a newborn infant?

"A. Some individual has — and I'm going to speculate just a little bit here. But I would speculate they probably grabbed the foot and then very violently shook it very hard."

He added: "So it's definitely abnormal but has just the absolute characteristics of what we call inflicted trauma. Someone has done this to this child. But as I mentioned, likely — and I'm speculating here — they grabbed the foot and then shake [*sic*] it very hard[,] very vigorously[,] enough to fracture these bones."

He also testified: "It was, like, purposeful to harm the infant. And often it's done to stop them from crying because some adult doesn't want them to cry."

Defense counsel forfeited this contention by failing to object below. Defendant also forfeited any contention that this was ineffective assistance of counsel by failing to raise it in her opening brief. (See part II.B, *ante*.)

In any event, these opinions were admissible.

We start with Dr. Miller's opinion that the injury could have been caused by grabbing and shaking. Just because he used the word "speculate" does not mean his opinion was speculative. He was asked what mechanism "can" cause the injury, not what mechanism "did" cause the injury. He answered that question. By saying that he was speculating, he emphasized that he was not saying how the injury was, in fact, caused, but only how it could have been caused. As to that, his opinion was not speculative.

Even assuming this testimony was objectionable, defendant was not prejudiced. Once again, Dr. Miller was merely describing one way the injury could have been caused. He further testified — without qualification — that the injury was "inflicted trauma" done "purposeful[ly] to harm the infant." He went on to testify that "the only kind of forces that would produce this type of injury are from direct nonaccidental trauma." That was what was important, not precisely how it was caused.

Dr. Miller's opinion that grabbing and shaking is often done to stop a baby from crying also was not speculative. Defendant argues, "No basis was ever given to support the conclusion that these injuries were inflicted because the child was crying." Once again, however, Dr. Miller merely testified that that is "often" why such an injury is inflicted. Moreover, immediately thereafter, he testified:

"Q. That's what you've seen over the thousands and thousands of scans in children you've seen over the years?

"A. Yes, that's correct."

This clinical experience afforded an adequate foundation for his opinion.

24

Again, alternatively, defendant was not prejudiced. There was ample other evidence of motive. Everybody agreed that the baby cried all the time. Defendant admitted to Dr. Young that she was stressed, frustrated, and overwhelmed. Although she denied saying that, eventually she admitted that she was "stressed with not being able to figure out [the baby]'s needs." There was also ample evidence that she caused the baby's other injuries. Absent the challenged opinions, the jury still would have concluded that defendant caused the ankle injury.

Finally, all of the testimony quoted above was harmless for an additional reason. The prosecutor told the jury that it could base its verdict on counts 2 and 3 on "the ribs," "the femur," or "the tibia." "There are three options, two counts." "You get to pick."[5] She further explained that the jury had to agree unanimously on which injury supported which count. Thus, even if there had been no evidence at all as to how or why defendant caused the ankle injury, the jury would have found defendant guilty on counts 2 and 3 based on the knee and rib injuries.

---

[5] Admittedly, it seems that, at that point, some jurors were not paying attention. The jurors sent out the question, "We need clarification on count 2 & 3 and what body parts are included." The trial court responded, "The prosecution is alleging three separate injuries for counts 2 and 3: the rib fracture; the tibia fracture; and the femur fracture." At that point, then, the jury got the message loud and clear.

# V

## PROSECUTORIAL MISCONDUCT IN CLOSING ARGUMENT

A. *Arguing Facts Not in Evidence.*

Defendant contends that the prosecutor committed misconduct by arguing facts not in evidence and thus appealing to passion and prejudice.

1. *Additional factual and procedural background.*

In closing argument, the prosecutor said: "And next we have from the beginning[,] from the outs[et, the baby] was crying in the hospital making it very difficult to bond with her and vice versa. . . . I believe that that is because from the beginning [the baby] knew the defendant didn't want her. We all know that babies can sense emotions, can sense how a person feels and reacts in that way. And from the entire pregnancy there have been these stressors that [the baby] has felt. There have been these feelings of disconnect that she has felt."

The prosecutor also said: "We have the torn frenulum which you get when you're shoving a bottle in the mouth, you're sticking a pacifier in the mouth forcefully because you want the child to be quiet."

Defense counsel did not object.

2. *Discussion.*

Yet again, defense counsel forfeited this contention by failing to object. Defendant also forfeited any contention that this was ineffective assistance of counsel by failing to raise it in her opening brief. (See part II.B, *ante*.)

We also reject the contention on the merits.

"[I]t is misconduct for the prosecutor to state facts not in evidence or to imply the existence of evidence known to the prosecutor but not to the jury. [Citation.]" (*People v. Smith* (2003) 30 Cal.4th 581, 617.) However, "'[p]rosecutors have wide latitude to discuss and draw inferences from the evidence at trial. [Citation.] Whether the inferences the prosecutor draws are reasonable is for the jury to decide.' [Citations.]" (*Ibid.*)

Likewise, it is misconduct for the prosecutor "' . . . to make arguments to the jury that give it the impression that "emotion may reign over reason," and to present "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response." [Citation.]' [Citation.]" (*People v. Linton* (2013) 56 Cal.4th 1146, 1210.) However, "'[a] prosecutor is allowed to make vigorous arguments and may even use such epithets as are warranted by the evidence, as long as these arguments are not inflammatory and principally aimed at arousing the passion or prejudice of the jury.' [Citations.]" (*People v. Pearson* (2013) 56 Cal.4th 393, 441.)

"We consider the remarks in the context of the argument as a whole and ""'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements."' [Citation.]" (*People v. Steskal* (2021) 11 Cal.5th 332, 353.)

Concerning the prosecutor's first quoted statement, defendant argues that there was no evidence "that an unborn child can feel such things." It is not at all apparent that the prosecutor was referring to an unborn baby rather than a newborn. A "baby," without any qualification, normally means an infant after birth. The only words the prosecutor used that even arguably suggest an unborn baby were that the baby had been stressed "from the entire pregnancy." However, this was ambiguous; it could mean "since the end of the pregnancy."

The prosecutor could properly argue that "babies can sense emotions." "'Counsel may argue facts not in evidence that are common knowledge or drawn from common experiences.' [Citation.]" (*People v. Mendoza* (2016) 62 Cal.4th 856, 908.)

Moreover, this statement did not appeal to passion and prejudice. The prosecutor faced the problem that the jurors might find it hard to believe that a mother might hurt her own child, especially when the defense could point to defendant's husband and other children as possible culprits. Thus, she quite properly brought out the fact that the baby was irritable — and irritating — and may even have been unwanted.

Even assuming the prosecutor's argument encompassed unborn babies as well as babies after birth, and thus was overbroad, any resulting error was harmless. We see no reasonable possibility that this momentary remark had any influence on the verdict. (See *People v. Johnsen*, *supra*, 10 Cal.5th at p. 1179 [prosecutor's "comment was limited and fleeting such that any error was nonprejudicial."].)

Concerning the prosecutor's second quoted statement, Dr. Young had testified that a torn frenulum can result from something being forced into a baby's mouth, including a bottle or a pacifier. Again, given the evidence of the baby's constant crying, it was a reasonable inference that that was how the torn frenulum occurred. This did not appeal to passion and prejudice; it simply reconstructed the crime.

B. *The Prosecutor's Comment That the Defense Can Subpoena Witnesses*.

Defendant contends that the prosecutor committed misconduct by commenting on her constitutional right to subpoena witnesses.

1. *Additional factual and procedural background*.

In closing argument, the prosecutor also said:

"And defense counsel keeps bringing up this child had this neurological disease that everybody missed. I didn't hear any doctor saying any evidence of that being at issue here. I didn't hear any doctor come through those doors to testify that there was some underlying concern. There's no evidence of that here.

"And defense — the defense has the same ability to subpoena witnesses as I do. He can do that just as well as I can. So if they wanted to bring somebody in — and again it's not their burden. It's my burden. But if they choose to put on their case, you get to judge it just like you do mine."

Defense counsel did not object.

29

2. *Discussion.*

Defense counsel forfeited defendant's present contention by failing to object. Defendant also forfeited any contention that this was ineffective assistance of counsel by failing to raise it in her opening brief. (See part II.B, *ante*.)

In any event, the contention fails.

"'It is fundamental that a defendant in a criminal case has a right to the process of the court to compel the attendance of witnesses [by subpoena] . . . .' [Citation.]" (*Smith v. Superior Court* (2020) 52 Cal.App.5th 57, 75-76.) Defendant asserts that "a prosecutor may not a[r]gue an inference of guilt from the exercise o[r] non[-]exercise of a constitutional right."

There is ample authority that a prosecutor must not comment adversely on the *exercise* of a constitutional right. (E.g., *Doyle v. Ohio* (1976) 426 U.S. 610, 618 [right to remain silent after arrest]; *Griffin v. California* (1965) 380 U.S. 609, 615 [right not to testify at trial]; *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 387 [right to counsel].) Defendant cites no authority, however, for the proposition that a prosecutor must not comment adversely on the *failure to exercise* a constitutional right. A defendant's failure to testify is a special case, because there is a constitutional right not to testify, as well as a constitutional right to testify; either choice is constitutionally protected.

It is occasionally said that a defendant has a right not to call witnesses. (E.g., *State v. Watters* (Ohio Ct. App. 2016) 76 N.E.3d 723, 730.) However, this is not literally true.

30

It simply means that the prosecution has the burden of proof; procedurally, it follows that the defendant can choose not to call any witnesses, to put the People to their proof, and to stand on the state of the evidence. However, while there is a right not to call a witness, in this limited sense, there is no right not to call a witness *without any consequences*.

"'[I]t is neither unusual nor improper to comment on the failure to call logical witnesses.' [Citations.]" (*People v. Rhoades* (2019) 8 Cal.5th 393, 448.) "[C]omment inviting the jury to draw a logical inference based on the state of the evidence, including comment on the failure to call available witnesses, is permissible except as limited by [Evidence Code] section 913 and *Griffin v. California . . . .*" (*People v. Ford* (1988) 45 Cal.3d 431, 449.)

Defendant tries to draw a distinction between commenting on a defense failure to call a logical witness and commenting that the defense has the subpoena power. We see no daylight between the two. A comment on the defense's failure to call a logical witness is inherently a comment on the defense's failure to exercise the subpoena power. If the defense did not have the subpoena power, its failure to call a logical witness would be irrelevant. Tellingly, defendant cites no case holding that prosecutorial comment on the subpoena power of the defense is misconduct.

## VI

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.


We concur:

McKINSTER
J.

FIELDS
J.